```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION
```

COREY NOVICK,

               Plaintiff,

        v.                       Case No. 08 C 3733

ROBIN STAGGERS, VICTOR          Hon. Harry D. Leinenweber
ROBERSON, DEPARTMENT OF
CHILDREN AND FAMILY SERVICES,
and OFFICE OF THE GOVERNOR,

               Defendants.

## MEMORANDUM OPINION AND ORDER

Before the Court are the Motions for Summary Judgment by Defendants Robin Staggers ("Staggers") and Victor Roberson ("Roberson"). For the reasons stated herein, both Motions are granted in their entirety.

## I.  BACKGROUND

Attorney Corey Novick ("Novick") met Defendants Staggers and Roberson when all three worked on the first gubernatorial campaign of Rod Blagojevich. Roberson was the Deputy Campaign Manager, having been a part of the campaign since its inception in 2000. Novick was the Director of Field Operations in suburban Cook County. After Blagojevich won the election in 2002, the three volunteered to serve on Blagojevich's transition team. Novick interviewed candidates referred for state jobs and made sure to let

Roberson and Staggers know he, too, was interested in a job. All three found state jobs after Blagojevich was sworn in.

Roberson worked in the Governor's Office as a "liaison," which he describes as someone who reviewed resumes and forwarded the suitable ones on to state agencies for their review. Novick describes Roberson's job as finding state government jobs for the politically connected. Staggers was hired at the Department of Children and Family Services ("DCFS") as the Deputy Director of the Office of Employee Services. Novick, after being interviewed by Staggers and DCFS Director Bryan Samuels ("Samuels"), was hired and started a four-year term contract as the Office of Employee Services legal advisor on July 1, 2003, reporting to Staggers. Novick says he mostly did union labor relations work. Staggers, at least for a time, "oversaw the hiring process" at DCFS. Def. Staggers Br., Ex. Z, at 22. DCFS Director Samuels, who was ostensibly Staggers' boss, testified he viewed him as not being very effective at his job and as someone who created a hostile work environment for his employees. Nonetheless, he felt powerless to discharge Staggers and felt that Novick was protected by the Governor's Office.

Around that time, DCFS began receiving federal subpoenas seeking personnel records as part of an investigation of possible violations of *Rutan v. Republican Party of Illinois* and the Veteran's Preference Act. *Rutan* is, of course, the historic 1990 U.S. Supreme Court decision mandating that only certain public

positions may be based on political affiliation and loyalty. *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990). The Veteran's Preference Act is a state law that gives hiring preference in public jobs to military veterans. 330 ILL. COMP. STAT. 55/0.01 *et seq*. News of the subpoenas hit the media, and Staggers, Novick and DCFS' Chief of Labor Relations Tom Putting ("Putting") were placed on paid administrative leave on October 25, 2005 by Samuels. They were reinstated on November 15, 2005 by order of the Governor's Office.

While Novick was on his paid leave, FBI agents visited him at his home and asked him questions about state hiring practices, including questions he says focused on Staggers and Roberson. Novick talked to investigators twice more after his reinstatement. He concedes he was questioned about his own involvement in hiring decisions and, in at least some of the interviews, his own resume padding.

After the leave, Staggers, Novick and Putting were all reassigned to new job titles within DCFS. Staggers contends after this point she had no say in personnel issues, but Novick contends she continued to be the personnel decision maker. Novick also contends Roberson, in the Governor's Office, had to sign off on all high-level DCFS employment decisions. Roberson disputes this, contending that John Harris, Blagojevich's Chief of Staff, had final say, but it seems clear that Roberson was at least in a position to influence Harris' decisions.

- 3 -

Novick's term expired at the end of June 2007. On June 20, 2007, DCFS was notified that the Governor's Office it was not renewing Novick's term, or the four-year terms of three other DCFS attorneys: Debra Dyer ("Dyer"), Sheila Riley ("Riley") and John Botner ("Botner"). Putting, who was not an attorney, had had his term renewed in 2006. It is uncontested that Botner was let go because of performance issues, but the two sides dispute why the others' terms were not renewed. Both sides agree Novick's employee performance reviews were good.

Staggers and Roberson contend Harris had put a stop to all term renewals. Novick disputes this, pointing to Putting's earlier term renewal. In any case, the sides agree that after the terms were not renewed, DCFS Deputy Director of the Office of Employee Services Michelle Smith ("Smith") and Classifications Manager Doug Mathis("Mathis") tried to re-write the job descriptions of Riley, Novick and Dyer to keep them employed at DCFS in "double exempt" or "at will" positions, a lengthy process.

Riley was moved to a vacant exempt position until a "double exempt" position for her was approved. Dyer, who directed all of the court services for juveniles at Cook County Juvenile Court, was let go on June 30, 2007 until her "double exempt" position was ready and she returned in October 2007.

Central Management Services ("CMS"), a state department that had to sign off on the creation of "double exempt" positions, refused to even forward to the Governor a request for such a

position for Novick. Staggers and Roberson say it was because Novick's position did not have enough subordinates reporting to it; Novick contends this is unsupportable hearsay.

Both sides agree that DCFS tried other routes to keep him employed, such as having his position declared exempt by categorizing it as "wholly professional," but CMS shut this down too. (The parties do not explain what "wholly professional" means.) DCFS also investigated making Novick's position exempt due to being federally funded, but as that was not true, this avenue failed too.

Finally, DCFS created a lower-level, lower-paying position for which it intended to submit Novick's name. The new DCFS director, Erwin McEwen ("McEwen"), supported this and wanted to place Novick in the position. CMS approved the position, as did the Governor's Office. But in an informal conversation with either Roberson or the Governor's Deputy Director Louanner Peters (McEwen can't remember which), McEwen learned that Novick "didn't have any support up there" in the Governor's Office. Def. Staggers Ex. BB, 78-81. McEwen took this to mean that it would be futile to continue trying to rehire Novick, and Novick admits McEwen gave up such efforts in the fall of 2007. McEwen also testified he got a similar between-the-lines rejection of the rehire of another employee, Addie Hudson and, like Novick, he did not know why the Governor's Office did not want her rehired.

- 5 -

Novick admits he did not explicitly tell anyone at DCFS about his discussions with the FBI until December 2007, when Roberson asked him specifically if he had been approached, and Novick told him he had.  But Novick says two conversations he had with DCFS General Counsel Liz Yore ("Yore") shortly after returning from his leave in 2005 would have made it clear to officials at DCFS that he had been approached by the FBI.  The exact contours of the conversation are disputed, but both Yore and Novick agree he did not explicitly mention he had had discussions with the FBI.  Both agree Yore advised him to retain counsel due to the investigation, but Novick further contends Yore refused to have DCFS provide one, saying the hiring improprieties investigation was unrelated to his job duties.

Novick filed suit against Staggers and Roberson under two causes of action:  42 U.S.C. § 1983 (for First Amendment retaliation) and for violation of the whistle blower provision of the Illinois State Officials and Employees Ethics Act.  5 ILL. STAT. COMP. 430/15-10.  DCFS and the Governor's Office were originally Defendants but were voluntarily dismissed by Novick.

## II.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The Court construes all facts and makes all reasonable inferences in a light most favorable to the nonmoving party.  Summary judgment is called for when the

nonmoving party is unable to establish the existence of an essential element of its case, and on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, No. 11-1929, 2012 U.S. App. LEXIS 10233, at *16 (7th Cir. May 22, 2012) (internal citations and quotations omitted).

### III.   <u>ANALYSIS</u>

### A. First Amendment Retaliation Claim Under 42 U.S.C. § 1983

Defendants fight the First Amendment retaliation claim on several fronts, contending Novick has no *prima facie* case of First Amendment retaliation (attacking all elements of the *prima facie* requirements) and that Defendants are entitled to qualified immunity.

### 1.   *Prima Facie Case*

To establish a *prima facie* case of First Amendment retaliation, an employee must show that: (1) the employee's speech was constitutionally protected; (2) the employee has suffered a deprivation likely to deter free speech; and (3) the employee's speech was a motivating factor in the employer's decision. *Redd v. Nolan*, 663 F.3d 287, 294-295 (7th Cir. 2011).

### a.   *Constitutionally Protected Speech*

Defendants contend Novick's cooperation with federal prosecutors was not constitutionally protected because he was speaking as a public employee pursuant to his job duties, not as a private citizen. *See, generally, Garcetti v. Ceballos*, 547 U.S.

- 7 -

410 (2006). This question is one of law for the Court and boils down to whether Novick spoke in the capacity of a private citizen on a matter of public concern. *Gross v. Town of Cicero*, 619 F.3d 697, 704 (7th Cir. 2010). Purely personal grievances do not qualify as matters of public concern, but the fact that an employee has a personal stake in the subject matter of the speech does not necessarily remove the speech from the scope of public concern. *Id.*

Here, nothing in Novick's job duties required him to report hiring misconduct to outside, federal investigators. It was not part of his official duties. *See Trant v. Okla.*, 426 Fed.Appx. 653, 660 (10th Cir. 2011) (finding a Chief Medical Officer's report of misconduct to a supervisory board was in the course of his duties, but comments about reporting misconduct to the FBI was protected speech.) *See also, Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1331-1332 (10th Cir. 2007) (ruling a local Head Start official's report of misconduct to the regional Head Start office was within job duties, but reporting the same misconduct to the Attorney General was protected speech). Nor does *Fairley v. Andrews*, as Defendants suggest, command a different conclusion. *Fairley v. Andrews*, 578 F.3d 518, 523 (7th Cir. 2009). In *Fairley*, the Seventh Circuit noted that the Constitution did not provide a remedy for reporting illegal acts, but that edict was given in the context of the employer reporting misconduct acts *to his work superiors*, the same situation as *Garcetti*. *Garcetti*, 547

U.S. at 414 (attorney's memorandum regarding misconduct was to his superiors).   Here, the misconduct was reported to outside authorities.

Defendants point to 89 Illinois Administrative Code 430.50, which requires DCFS employees to cooperate with Office of Inspector General investigations.   This shows Novick was acting pursuant to his official duties, they say.   However, that regulation says nothing about cooperating with federal investigations.   Defendants also claim that Novick, as a government lawyer, had a duty to cooperate with investigators.   They cite *In re: A Witness Before The Special Grand Jury*, 288 F.3d 289, 293 (7th Cir. 2002).   That case, however, ruled that in a criminal grand jury proceeding, a government attorney, who had acted in an attorney-client capacity with state officials, had to divulge those confidences in spite of attorney-client privilege because he had a higher duty as the people's lawyer.

Here, the Court is not convinced it can extrapolate from that case to this one, which is not a case about when attorney-client privilege applies, and Novick was not being asked to divulge DCFS's confidences.   Rather, Novick was approached not for anything he had learned in his capacity as an attorney, but merely as someone working in the office.

The Court finds Novick's situation more analogous to *Mastrisciano v. Randle*, 569 F.3d 723, 730-731 (7th Cir. 2009) (*superseded on other grounds as stated in Greene v. Doruff*, 660

- 9 -

F.3d 975, 977 (7th Cir. 2009)). There, the Court found that a prison guard who testified on his day off at a prisoner's review board hearing was speaking as a private citizen. Here, in at least the first interview with investigators, Novick spoke at his home. Moreover, there is an issue of material fact as to whether he was on work time when he subsequently spoke to federal investigators, because Novick has presented evidence that he received permission from DCFS legal counsel Liz Yore that he could leave work to attend the meetings, so the subsequent interviews were potentially protected speech not rendered in his official capacity as well.

The testimony that DCFS refused to provide Novick with a lawyer for his interviews with the FBI on the grounds that it was unconnected to his employment only supports the conclusion that Novick was speaking as a private citizen.

Lastly, Defendants contend Novick's speech was not a matter of public interest because it was motivated by a desire to save his own skin. Novick had fudged his resume and therefore he cooperated with investigators to curry favor and avoid any charges against himself, they say. While Novick clearly had a personal interest in talking to the FBI that does not preclude First Amendment protection. *See Gross*, 619 F.3d at 704. Novick's comments were not solely about his personal grievances. To the contrary, Novick had no grievance; *he* was approached by the FBI. Moreover, political patronage hiring improprieties are undoubtedly a matter

of public interest, as the newspaper articles about the federal investigation cited by Novick show.

### b. *Deprivation Likely to Deter Free Speech*

Defendants do not seriously contest that DCFS and the Governor's refusal to rehire Novick was a deprivation likely to deter free speech. Defendant Roberson conflates the First and Fourteenth Amendment by arguing that Novick had no constitutionally recognized property interest in his job because it was a term appointment, but offers no case law for the proposition that that 14th Amendment test of what constitutes property is the same test as what constitutes adverse employment action for purposes of First Amendment retaliation claims. To the contrary, the Seventh Circuit has noted the adverse employment action is not as strict as that required in other employment contexts, such as in Title VII cases. *See Mosely v. Bd. of Educ.*, 434 F.3d 527, 534 (2006) (noting that even "'a campaign of petty harassment' that includes 'minor forms of retaliation' and 'false accusations' can be actionable under the First Amendment.'"). While reappointment to a term position not have been Novick's property right, the Court finds that the deliberate derailment of attempts to rehire (particularly where the evidence shows the DCFS Director wanted him rehired) would certainly be enough to deter a person of "ordinary firmness" from free speech. This element is satisfied.

c. *Causation*

The requirement that the protected speech was a motivating factor in the employer's decision to terminate Novick is where his case falls apart. As Defendants point out, in order for the speech to be a factor in the decision, Roberson and Staggers would have had to have known about Novick's conversations with federal investigators. Novick's points to several pieces of evidence he says demonstrates this.

First, he points to Putting's testimony that Roberson, in the presence of Staggers in October 2007, told Putting that "Corey [Novick] was not renewed because he made a complaint to the OIG." Def. Staggers Ex. JJ, 144. As discussed above, the OIG (Office of the Inspector General) is an entirely different ball game from the FBI, because cooperation with the FBI was not a part of Novick's job; cooperation with the OIG was. Aside from any speech to the OIG likely not being protected speech, nothing in Putting's testimony infers that Roberson knew of conversations with the FBI, around which this Complaint is centered.

Next, Novick claims Putting told him that Roberson told Putting that Novick was "the cause of all of their problems." One might argue that "all of their problems" might encompass more than just the OIG comment and might support an inference that Roberson believed Novick was the cause of the FBI problem as well. In addition to this being a somewhat Herculean inference, it fails to prevent summary judgment because, unfortunately for Novick, Putting

- 12 -

never testified to this "cause of all of their problems" comment, despite Novick's attorney repeatedly trying to get him to do so at deposition. This comment comes only from Novick, relating what he remembered Putting telling him about Putting's conversation with Staggers and Roberson. As such, it is inadmissible as hearsay between Putting and Novick and cannot support Novick's case on summary judgment.

Third, Novick maintains that his conversations with DCFS General Counsel Liz Yore could have tipped off DCFS, Roberson, and Staggers off that he had spoken to the feds. In those conversations, held in approximately December 2005, Yore advised Novick that he may want to retain criminal counsel. As Novick conceded "I don't think I quite said [to Yore] I talked to [federal investigators]." Def. Staggers Ex. UU, at 166. That Yore offered this advice is not surprising since Novick, Staggers and Roberson had recently been suspended after subpoenas seeking their personnel records arrived at DCFS and media reports surfaced announcing that high-level administrators at DCFS were under investigation. The advice does not support an inference that Yore somehow divined from this interaction that Novick had been talking with federal investigators; it merely supports an inference that Novick, like others in the office, was a potential target of the FBI.

Novick points to the fact that he eventually told Roberson he had talked to the FBI, but this occurred in December 2007, approximately six months after the contract was not renewed. By

that point, it was well after DCFS Director Erwin McEwen ended his attempts to bring Novick back.  Pl.'s Answer to Staggers' USOF, ¶ 76.

There is other evidence that Novick points to (such as Staggers and Roberson at various points indicating they wanted to talk to him about things that were going on – but never actually talking to him), but all of it involves even greater supposition and speculation, not inferences. "Speculation is not sufficient to overcome summary judgment." *Trigillo v. Snyder*, No. 03-3241, 2006 U.S. Dist. LEXIS 28598, at *36 (C.D. Ill. May 10, 2006).

*Trigillo* is a very apt comparison to this case because in *Trigillo,* the Plaintiff claimed First Amendment violations after reporting her state employer, the Department of Corrections, to the FBI for bid rigging.  Like Novick, Trigillo's term employment was not renewed.  The FBI quickly responded to Trigillo's tip by raiding the office.  As it coincidentally happened, one of the FBI agents on the raid was a childhood friend of Trigillo's who chatted her up during the raid, causing one of Trigillo's co-workers to remark immediately after the raid "My, you were awfully chummy with the FBI agent." *Id*. at *12.  Still, the Court ruled, this was not enough to support an inference that Trigillo's supervisors knew she was the FBI informant.  The Seventh Circuit upheld this specific finding. *Trigillo v. Snyder*, 547 F.3d 826, 830 (7th Cir. 2008).

If open (albeit veiled) speculation in an office that a plaintiff is the FBI mole cannot sustain an inference that the

- 14 -

plaintiff's employer knew her to be the informant, then Novick's even more removed proof here must fail as well. There simply is not enough evidence that Roberson or Staggers believed Novick was talking to the FBI.

Because there is no causation demonstrated by Novick, and thus no *prima facie* case of a First Amendment violation, the Court does not reach the alternative theories of Defendants that the *prima facie* case fails because Novick's speech was unprotected as a policy maker, or because Novick cannot survive the *Connick-Pickering* balancing test. *See Coady v. Steil*, 187 F.3d 727, 732 (outlining history and details of test established by *Pickering v. Bd. of Educ. of Twp. H.S. Dist. 205*, 391 U.S. 563 (1968) and *Connick v. Myers*, 461 U.S. 138 (1983)).

### 2. Qualified Immunity

Alternatively, Defendants are entitled to qualified immunity. "Qualified immunity protects government officials from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known." *Surita v. Hyde*, 665 F.3d 860, 868 (7th Cir. 2011) (internal citations and quotations omitted). Analysis of qualified immunity involves two questions: (2) whether a constitutional right was violated using plaintiff's version of the facts, and (2) whether that right was clearly established at the time. *Id.*

The Court has already determined that failing to rehire someone who would have otherwise been rehired as retaliation for cooperating with the FBI, in this context, would have been a violation of the First Amendment. However, this Court must answer the second question in the negative. The Seventh Circuit has repeatedly stated that to be clearly established, a right must be specific to the relevant factual content of a cited case and not generalized. While the Tenth Circuit has made clear that retaliation for speaking with the FBI is a First Amendment violation, an average reasonable person in this district would look to the Seventh Circuit for direction on this issue. The most factually relevant case is *Trigillo*, and in that case, the Seventh Circuit avoided making a decision on that issue. While the court in that case definitively stated that Trigillo's talking to the Illinois attorney general and the director of a state agency about procurement improprieties clearly fell within her job description (and thus was not protected speech), it pointedly left the question of protection for talking to the FBI alone. Instead, the court opted to dispense with that issue because of the lack of evidence that her employers knew she had talked to the FBI. Thus the Seventh Circuit had not clearly ruled such speech protected, and that could lead a reasonable person to believe the issue was still open for debate.

Novick's invocation of *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) and other cases do not change this. Those cases came before

the watershed case of *Garcetti*, which changed the landscape for a public employee's protected speech. Thus, the right was not clearly established at the time Novick's employment was not renewed, and the Defendants are entitled to qualified immunity.

## B. Illinois State Officials and Employees Ethics Act Whistle Blower Protection

### *1. Jurisdiction*

As a threshold issue, the Court must determine if it has jurisdiction over this count. Defendants note that, while Illinois has explicitly waived sovereign immunity in its own courts in regards to this statute, nothing in the statute indicates lawmakers meant to grant jurisdiction to the federal courts. To the contrary, 5 ILL. COMP. STAT. 430/15-25 provides that "[t]he circuit courts of this State shall have jurisdiction." *Hosick v. Chi. State Univ.*, No. 10-5132, 2011 U.S. Dist. LEXIS 145404, at *21 (N.D. Ill. Dec. 19, 2011).

Novick counters that the lawsuit is also against Roberson and Staggers in their individual capacities, which is not barred by the Eleventh Amendment of the U.S. Constitution. To the extent that Novick seeks back pay and restitution to his job, these are remedies that can only be granted by the state and are barred. But to the extent he seeks monetary damages from the two individual defendants, the Eleventh Amendment provides no hurdle. *See Benjamin v. Ill. Dep't of Fin. and Prof'l Regulation, et al.*, No. 09-5019, 2011 U.S. Dist. LEXIS 87269, at *28 (N.D. Ill. Aug. 8,

2011) (allowing claim under the Illinois State Officials and Employees Ethics Act against individual employees to proceed, but only for damages, not restitution and back pay). The Court notes, however, that Seventh Circuit case law on the Eleventh Amendment decrees that any judgment against Staggers and Roberson would have to come from their pockets, not the state treasury. *See Kroll v. Bd. of Trs. of Univ. of Ill.*, 934 F.2d 904, 907-908 (7th Cir. 1991) ("A victory in such a suit, however, is a victory against only the individual defendant; an award of damages may be executed only against that official's personal assets.")

## 2. *Evidence of Retaliatory Action*

While neither party suggests the First Amendment retaliation framework should be used to judge retaliatory actions under the State Officials and Employees Ethics Act, it is a matter of logic that a party cannot retaliate for something it does not know occurred. As discussed above, Novick has not presented any evidence that Defendants knew Novick had cooperated with the FBI. Accordingly, Novick cannot establish he was retaliated against for speaking with federal investigators.

Putting's testimony that Roberson said Novick was not rehired because Novick made a complaint to the OIG, however, could establish a whistle blower violation under the statute, because providing information before any public body conducting an investigation is protected conduct. 5 ILL. COMP. STAT. 430/15-10(2).

Putting provided adequate testimony to establish an issue of material fact regarding whether Staggers and Roberson were the actual, if not titled, powers regarding hiring and retention at DCFS. Roberson's willingness to announce freely in Staggers' presence (according to Putting) that Novick had been fired because of his involvement in the OIG investigation supports an inference that both Roberson and Staggers believed Novick had cooperated in the OIG investigation and it was the reason for his firing.

But Roberson points out that the statute carefully defines "retaliatory action" as "the reprimand, discharge, suspension, demotion, denial of promotion or transfer, or change in the terms or conditions of employment of any State employee . . ." 5 ILL. COMP. STAT. 430/15-5. Roberson claims the failure to renew a term employment with a set expiration date is not covered by this definition. This appears to be a matter of first impression untouched by the Illinois Supreme Court or the Illinois Appellate Courts. Novick does not respond to this argument in any meaningful way. He merely offers that it was an "adverse employment action" as he argued in his First Amendment claim. Pl.'s Resp. 13.

But the Ethics Act is not the First Amendment, and the statute does not use the phrase "adverse employment action" anywhere in its text. Defendants have raised a legitimate argument as to the applicability of the statute in this instance and Novick has not responded in any meaningful way. "Unsupported and underdeveloped

arguments are waived." *Merryman Excavation, Inc. v. Int'l Union of Operating Eng'rs, Local 150*, 639 F.3d 286, 291 (7th Cir. 2011).

Where possible, federal courts may choose to resolve a case without intruding on the prerogative of Illinois courts to interpret their own statutes. *See DeGenova v. Sheriff of DuPage County*, 209 F.3d 973, 977 n.2 (7th Cir. 2000). Because Novick provided no meaningful response to Defendant's argument that the statute does not apply, the Court deems Novick waived the argument that the statute applies in this instance, and summary judgment on the count is granted.

## IV.  CONCLUSION

For the reasons stated herein, summary judgment on behalf of the Defendants is granted on all Counts.


**IT IS SO ORDERED.**

_____
          Harry D. Leinenweber, Judge
          United States District Court

**DATE:** June 19, 2012

- 20 -